UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLIOT SCOTT GRIZZLE,<br><br>                              Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, individually and officially; SHERIFF WILLIAM GORE; LIEUTENANT LOVELACE; LIEUTENANT FROISTAD; AARON BOORMAN; and DOES 1–25,<br><br>                              Defendants. | Case No.:  17-CV-813 JLS (WVG)<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DIRECTING THE CLERK OF THE COURT TO ENTER JUDGMENT ACCORDINGLY**<br><br>(ECF Nos. 148, 153) |

Presently before the Court are Defendants County of San Diego (the "County"), Sheriff William Gore, Lieutenant Lena Lovelace, and Aaron Boorman's (collectively, "Defendants") Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("MSJ," ECF No. 148) and Supplemental Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment on the Grounds of Failure to Exhaust Under the Prison Litigation Reform Act (the "PLRA") ("Supp. MSJ," ECF No. 153).  Also before the Court are Plaintiff Elliott Scott Grizzle's ("Plaintiff" or "Grizzle") Opposition to ("Opp'n," ECF No. 163) and Defendants' Reply in support of ("Reply," ECF No. 165) the

/ / /

MSJ and Supplemental MSJ.[1]  Having carefully considered the Parties' arguments, the full record, and the law, the Court **GRANTS** Defendants' MSJ and Supplemental MSJ for the reasons that follow and **DIRECTS** the Clerk of the Court to enter judgment accordingly.

## PROCEDURAL BACKGROUND

Plaintiff initially filed this civil rights action pursuant to 42 U.S.C. § 1983 in *pro se*[2] on April 24, 2017.  *See* ECF No. 1 ("Compl.").  Plaintiff claimed his Eighth and Fourteenth Amendment rights were violated when he was housed in the San Diego Central Jail ("SDCJ") in 2016 and 2017.  *See id.* at 1.

The operative pleading in this matter is Plaintiff's Third Amended Complaint.  *See* ECF No. 110 ("TAC").  While in his original Complaint Plaintiff named as defendants more than forty individuals alleged to be employed by the San Diego County Sheriff's Department, in his TAC he names only five defendants.  In the Court's August 27, 2019 Order granting in part and denying in part Defendants' motion to dismiss Plaintiff's Second Amended Complaint ("SAC"), Plaintiff was given leave to file his TAC.  *See* ECF No. 108.  In that Order, Plaintiff was specifically cautioned that his amended pleading "must be complete in itself without reference to the original complaint," and that "[a]ny claims not re-alleged in the amended complaint will be considered waived." *Id.* at 16 (citing *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925, 928 (9th Cir. 2012)).  In his TAC, Plaintiff no longer names Defendants Smith, Kamoss, Goings, Brewer, Johns, Navarro, Fowler, De La Torre, Gardner, Sims, Seely, Oliver, Hepler, Cole, McKemmy, Gallegas, Martinez, Bullock, Vargas, Zepeda, Gonzalez, White, Ramos, De La Cruz, Huerta, Ellsworth, Bass, Olsen, Mendoza, Agnew, Cerda, Warren, Stratton, Epps, Mondragon, Barrios, Camalleri, Williams, Moon, Newlander, Davida, Price, Bravo, Leon, or Rios.  Accordingly, the claims

---

[1] Additionally, after denial of Defendants' motions to seal portions of the MSJ and Supplemental MSJ, *see* ECF Nos. 146–47, 151–52, 155, Defendants submitted unredacted versions of several of the documents contained therein.  *See* ECF Nos. 161 ("MSJ Supp."), 162 ("Supp. MSJ Supp.").  The Court will cite to these unredacted versions as appropriate in this Order.

[2] Plaintiff is no longer proceeding *pro se* and currently is represented by counsel.

2

against these Defendants are deemed waived, and the Court **DIRECTS** the Clerk of the Court to terminate these Defendants from the Court's docket. *Lacy*, 693 F.3d at 925, 928.

On October 11, 2019, the remaining Defendants—Defendants and Lieutenant Froistad—filed a motion to dismiss Plaintiff's TAC. *See* ECF No. 111. On August 17, 2020, this Court granted in part and denied in part Defendants' and Lieutenant Froistad's motion to dismiss. *See* ECF No. 120. Specifically, the Court dismissed all claims against Defendant Froistad, Plaintiff's first cause of action against both Defendants Gore and Boorman, and Plaintiff's requests for injunctive and declaratory relief. *See id.* at 9. Defendants were ordered to answer all the remaining claims and causes of action. *See id.* On August 31, 2020, Defendants filed their Answer to Plaintiff's TAC. *See* ECF No. 121.

Defendants have now filed the two instant Motions for Summary Judgment. *See* MSJ, Supp. MSJ. In their MSJ, Defendants seek summary judgment on the ground that there are no triable issues of material fact as to any of Plaintiff's claims. *See generally* MSJ. In their Supplemental MSJ, Defendants seek summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies prior to filing this action as required by 42 U.S.C. § 1997e. *See generally* Supp. MSJ. After receiving an extension of time, Plaintiff filed a combined Opposition to both Motions on March 8, 2022. *See* Opp'n. Defendants filed an omnibus Reply on March 22, 2022. *See* Reply.

## LEGAL STANDARD

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient

evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the nonmoving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the nonmoving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the nonmoving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." *Id.* But if the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad, Inc*., 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp*., No. 11–09068, 2013 WL 1010547, *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). A "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly

probative.'" *Anderson*, 477 U.S. at 249–50 (citation omitted); *see also Hardage v. CBS Broad. Inc*., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment.  *See Nissan Fire & Marine*, 210 F.3d at 1103.

## ANALYSIS

## I.  Defendants' MSJ (ECF No. 148)

### A.  *Plaintiff's Status as Pre-Trial Detainee and Convicted Prisoner*

As an initial matter, the Court must determine whether the Eighth Amendment or Fourteenth Amendment applies to Plaintiff's claims arising from his conditions of confinement while housed in SDCJ.  "Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016).

Plaintiff's claims arise from his confinement in SDCJ from August 3, 2016, to August 27, 2017.  *See* TAC at 1.  Prior to his confinement at SDCJ, Plaintiff had spent twenty-four years in the "custody of the California and Federal Prison systems."  Defs.' Separate Statement of Undisputed Facts ("Defs.' SSUF," ECF No. 161-1) at No. 2.  From 1993 to 2016, Plaintiff had been charged with assault, possession of a weapon, murder, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), robbery, and felony murder.  *See* Deposition Transcript of Elliott Grizzle ("Grizzle Depo. Tr.," ECF No. 161-2 Ex. A) at 53–56.  When Plaintiff was previously in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), Plaintiff had been housed at Pelican Bay State Prison ("PBSP") in the Secured Housing Unit ("SHU") on two separate occasions, from 1993 to 2002 and from 2006 to 2015.  *See id.* at 79:1–13.  Plaintiff had been housed in the SHU for both "negative behavior" and as a "result of validation as an associate in a prison gang."  *Id.* at 79:11–13.  Plaintiff had been validated as "an associate of the Aryan Brothers" in approximately 1994, and sometime after 2006 his validation was changed to "being a member."  *Id.* at 64:4–14.  Plaintiff does not "disagree with the

CDCR's validation of [him] as an associate or as a member" of the Aryan Brotherhood gang. *Id.* at 71:23–25.

Plaintiff was out of custody from November 2015 until June 2016, when he was arrested in Nevada. *Id.* at 44:4–7; 42:16–24; 43:8–11; 166:10–24. Plaintiff was extradited to San Diego in 2016, where he faced criminal charges. *Id.* at 53:19–23.

When Plaintiff was initially housed in SDCJ in August of 2016, he had not yet fully undergone the debriefing process, which is a "mechanism" for disassociating from gang activity. *Id.* at 66:13–15. Plaintiff completed the debriefing process sometime after September of 2017. *See id.* Plaintiff was convicted of various criminal charges on March 28, 2017. *See* Defs.' List of Evidence ("LOE," ECF No. 148-2) Ex. F (Abstract of Judgment).

Accordingly, the Court finds that Plaintiff was a pretrial detainee from the time he was first housed in SDCJ on August 3, 2016, up to the date he was convicted of criminal charges on March 28, 2017. As a result, from August 3, 2016, to March 28, 2017, the Fourteenth Amendment applies to the claims brought by Plaintiff. As to any claims arising after March 28, 2017, Plaintiff is a convicted prisoner, and the Court must apply Eighth Amendment standards. *See Castro*, 833 F.3d at 1067–68.

### B.   Fourteenth Amendment Due Process Claim

Defendant Lovelace moves for summary judgment as to Plaintiff's Fourteenth Amendment due process claim in his first cause of action relating to his initial and continued placement in administrative segregation ("ad-seg"). *See* MSJ at 24–25.

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). "To state a procedural due process claim, [a plaintiff] must allege '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (and) (3) lack of process.'" *Wright v.*

*Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)); *see Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding Due Process Clause of the Fourteenth Amendment prevents punishment of a pretrial detainee prior to an adjudication of guilt); *Castro*, 833 F.3d at 1068; *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002). Disciplinary segregation as punishment for violation of jail rules and regulations cannot be imposed without due process, *i.e.*, without complying with the procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974). *See Mitchell v. Dupnik*, 75 F.3d 517, 523–26 (9th Cir. 1996); *see also Stevenson v. Jones*, 254 F. Supp.3d 1080, 1093 (N.D. Cal. May 30, 2017).

Plaintiff's TAC alleges that Defendant Lovelace "conducted the initial evaluation of Plaintiff" when Plaintiff was first housed in ad-seg in August 2016 and "determined that he should be placed in administrative segregation" without due process. TAC at 15. However, Lovelace attests that she did not work at SDCJ in 2016 and instead transferred to SDCJ on January 7, 2017. *See* Declaration of Lena Lovelace ("Lovelace Decl.," ECF No. 148-11) ¶ 2. Thus, there is no evidence in the record that she ever had any involvement in the decision to initially retain Plaintiff in ad-seg in 2016 or in his continued housing in ad-seg. Lovelace further attests that she had "absolutely no involvement in the assignment of [Plaintiff]" to ad-seg, nor was she ever "aware of the length of time that Plaintiff was present" in ad-seg or "in SDCJ in general." *Id.* ¶ 5. Moreover, she was not a member of the Jail Population Management Unit ("JPMU") in 2016 or 2017, which is the unit that "assigns housing and security levels to inmates during the classification process and is responsible for conducting the seven day reviews of inmates assigned to administrative segregation." *Id.* ¶ 6. Because Lovelace was not a member of this unit, she "did not have the authority at any point in time mentioned in the TAC to order that [Plaintiff] be removed or remain" in ad-seg. *Id.* ¶ 7. Even if Plaintiff had directly requested that Lovelace do something about his housing in ad-seg because "he did not believe that he belonged in [ad-seg], or had concerns about the classification process," Lovelace would have "informed him that he needed to speak with someone in JPMU, or to submit a grievance or written

request." *Id.* ¶ 9.  Lovelace maintains that she "did not have authority to make decisions regarding [Plaintiff's] classification and placement in administrative segregation." *Id.*

Plaintiff's Opposition is devoid of any evidence to dispute Lovelace's evidence that she did not have any involvement in the initial decision to place Plaintiff in ad-seg or any authority to remove him from ad-seg.  Instead, Plaintiff conclusorily states that Lovelace should "stand trial" because of her alleged knowledge of the conditions of his confinement, Opp'n at 39–40; yet, he offers no evidence that Lovelace participated in any way in the alleged deprivation of his due process rights under the Fourteenth Amendment as it pertains to how he came to be housed in ad-seg or the process that was used to maintain his presence in ad-seg.  Once Lovelace met her burden of providing evidence that she did not violate Plaintiff's right to due process under the Fourteenth Amendment, the burden shifted to Plaintiff to point to evidence in the record that would dispute her evidence.  He has not done so.  Accordingly, the Court finds that there is no triable issue of material fact indicating that Lovelace violated Plaintiff's due process rights; thus, Lovelace is entitled to summary judgment as to Plaintiff's Fourteenth Amendment due process claims.

### C. *Conditions of Confinement Claims*

The remaining claims in Plaintiff's TAC involve his allegations that he was subjected to conditions of confinement while housed in SDCJ that violated his constitutional rights.  As set forth above, for some of the time period relevant to Plaintiff's claims he was a pretrial detainee, and, at other times, he was a convicted prisoner.[3] "Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro*, 833 F.3d at 1067–68.

---

[3] Plaintiff's counsel argues that because Plaintiff later had his sentence vacated he was not a convicted prisoner at any time while he was housed at SDCJ.  *See* Opp'n at 12 (citing *People v. Grizzle*, No. D072975, 2019 WL 947079, at *25 (Cal. Ct. App. Feb. 27, 2019), *as modified on denial of reh'g* (Mar. 12, 2019)).  However, while Plaintiff prevailed in having his sentence vacated and is subject to resentencing, his conviction has remained intact, and Plaintiff cites no case law to support his claim that his status as a prisoner as of March 2017 has changed.

Under either Amendment, Plaintiff must demonstrate facts sufficient to show that Defendants acted with "deliberate indifference" in order to state a plausible claim for relief. *Id*. at 1068; *Iqbal*, 556 U.S. at 678; *see also Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) ("[A] defendant's conduct must be objectively unreasonable, a test that will necessarily turn[] on the facts and circumstances of each particular case.") (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)) (internal quotation marks omitted).

### 1.   *Defendant Lovelace—Deliberate Indifference*

Defendant Lovelace moves for summary judgment as to all Plaintiff's conditions of confinement claims against her on the ground that Plaintiff has failed to overcome Lovelace's showing that she was not deliberately indifferent to his conditions of confinement claims found in his second, third, and fourth causes of action in his TAC.  *See* MSJ Supp. at 26.  Lovelace argues that Plaintiff lacks any evidence that Lovelace "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff's health."  *Id*.  As set forth above, during the time period in which Plaintiff alleges that he interacted with Lovelace, he was a pretrial detainee; thus, his claim of deliberate indifference relating to the conditions of his confinement arises under the Due Process Clause of the Fourteenth Amendment.  *See Castro*, 833 F.3d at 1067–68.

The Ninth Circuit has found that a "pretrial detainee who asserts a due process claim for failure to protect" must "prove more than negligence but less than subjective intent." *Id*. at 1071.  *Castro* held that the elements of a pretrial detainee's deliberate indifference claim against a deputy are:

> (1)   The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2)   Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3)   The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the

9

circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4)   By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

In his TAC, Plaintiff alleges that Lovelace "was aware of the constitutionally deficient Ad-Seg program at [SDCJ], but still subjected Plaintiff to the constitutional injury," which included "sleep deprivation, lack of outdoor exercise, and forcing inmates to choose between sleep and exercise." TAC at 5.

As noted above, Lovelace has supplied a declaration under penalty of perjury to support her argument that she did not act with deliberate indifference towards Plaintiff. *See* Lovelace Decl. In her declaration, Lovelace explains that she was a "line Lieutenant" at SDCJ from January 7, 2017, when she was transferred to that facility, through the rest of the timeframe referenced in Plaintiff's TAC. *Id.* ¶ 10. Plaintiff was housed on the seventh and eighth floors of SDCJ, but Lovelace's "primary work location" was on the "second floor of the jail." *Id.* In her role as a lieutenant, Lovelace would conduct "at least one walkthrough of the facility each day," which also included a walkthrough of the "housing modules." *Id.* ¶ 11. Lovelace only would interact directly with an inmate if an inmate refused to come out of his cell for a cell inspection. *Id.* ¶ 13. In those instances, Lovelace would "respond to the housing unit to speak with the inmates" prior to deputies performing a cell extraction. *Id.* While Lovelace is "aware that [Plaintiff] said he told me verbally about some of the issues in the TAC," she declares she did not have any discussions with Plaintiff. *Id.* ¶ 14.

In his deposition, Plaintiff testified that he "talked to – or attempted to talk to Miss Lovelace a couple of times and explain the situation and my desire for relief from them and that they were unproductive." Grizzle Depo. Tr. at 163:17–20. Plaintiff further testified that his interactions with Lovelace occurred in "[l]ate 2016, early 2017" during

"weekly inspections," but he was not "afforded the opportunity to stay there and have a conversation." *Id.* at 164:7–17.  However, as set forth above, the evidence in the record demonstrates Plaintiff could not have had a conversation with Lovelace in 2016, because she was not assigned to SDCJ in 2016.

In order to satisfy the third element set forth in *Castro*, Plaintiff "must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent – something akin to reckless disregard.'" *Sandoval v. Cnty. of San Diego,* 985 F.3d 657, 669 (9th Cir. 2021) (quoting *Castro*, 833 F.3d at 1071).  "[T]he defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Castro*, 833 F.3d at 1071.  Here, Plaintiff's own testimony is that he only "attempted" to talk to Lovelace about his complaints "a couple of times."  Grizzle Depo. Tr. 163:17–20; 164:7–17.  There is no evidence in the record that Plaintiff told Lovelace of the specific factual allegations—such as the constant illumination, denial of outdoor exercise, or excessive noise—found in his TAC.  Nor is there any evidence in the record that Plaintiff specifically told Lovelace that he suffered any harm as a result of the alleged conditions he was subjected to.  Thus, even viewing these facts in the light most favorable to Plaintiff, the Court finds that Plaintiff's evidence does not satisfy the third *Castro* element.  Vague allegations that Plaintiff spoke to Lovelace on two occasions, or "attempted" to speak with Lovelace on two occasions, would not have alerted Lovelace that there was a "high degree of risk" of injury to Plaintiff.  *Castro*, 833 F.3d at 1125.  Thus, the Court finds there is no evidence of deliberate indifference on the part of Lovelace.

For these reasons, the Court finds Defendant Lovelace is entitled to summary judgment with respect to Plaintiff's Fourteenth Amendment conditions of confinement claims found in counts two, three, and four of his TAC.

### 2.  *Defendant Boorman—Deliberate Indifference*

Defendant Boorman moves for summary judgment as to all Plaintiff's conditions of confinement claims on the ground that he was not deliberately indifferent to Plaintiff's

needs when he responded to correspondence that Plaintiff addressed to Sheriff Gore.

The claims raised by Plaintiff against Boorman, at the very earliest, occurred on March 29, 2017, which is the day that Plaintiff wrote a letter to Sheriff Gore to which Boorman responded. It is undisputed that Plaintiff was convicted on March 28, 2017, on murder, robbery, and burglary charges, *see* Pl.'s Separate Statement of Undisputed Facts ("Pl.'s SSUF," ECF No. 163-2) at No. 14, despite Plaintiff claiming that "Mr. Grizzle's conviction for felony murder has been overturned and it is not currently final," *id.* Moreover, this assertion is not supported by the opinion referred to by Plaintiff; in fact, the California Appellate Court vacated Plaintiff's sentence and remanded "to the superior court to resentence Grizzle consistent with this opinion." Declaration of Kevin McNamara ("McNamara Decl.," ECF No. 163-1) Ex. B at 28. Thus, Plaintiff's conviction was not overturned. Accordingly, the Court finds that, because Plaintiff was a convicted prisoner at the time his claims against Boorman arose, the Eighth Amendment subjective deliberate indifference standard applies to these conditions of confinement claims.

The Constitution "does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Conditions of confinement "may be, and often are, restrictive and harsh[.]" *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Rhodes*, 452 U.S. at 347). However, the Eighth Amendment imposes duties on jail officials to "provide humane conditions of confinement[,] . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the[ir] safety.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). Deprivations of these "life[] necessities" must be "sufficiently grave" in order to form the objective basis for an Eighth Amendment violation. *Id.* at 834. The Eighth Amendment further requires a plaintiff to show the defendant acted with "deliberate indifference." *Id.* at 834, 837. Deliberate indifference includes a subjective component: a prisoner must allege facts sufficient to plausibly show the defendant actually knew and consciously disregarded an "excessive risk to [his] health or safety." *Id.*

/ / /

The undisputed facts show that Plaintiff wrote a letter to Sheriff Gore on March 29, 2017.  *See* LOE Ex. D.  The subject line of this letter reads: "Conditions of Confinement @ SDCJ (i.e. sleep deprivation/denial of access to administrative remedies – grievance processs)."  *Id.* at 14.  Plaintiff indicated that he was writing to inform Sheriff Gore "to put him on notice that the program of your facility is causing me to suffer severe sleep deprivation."  *Id.*  Specifically, Plaintiff claimed that there were issues with a "bright light" during evening count, being woken during razor distribution between 11:30 p.m. and 12:30 a.m., and being woken at 3:30 a.m. when breakfast was distributed.  *Id.*  He also claimed that there were mentally ill inmates who "scream [and] bang often all night."  *Id.*  Plaintiff alleged that staff only allow "routine sick calls [and] blood draws at night forcing [him] to choose between health care and sleep."  *Id.*  Plaintiff claimed he was only offered outdoor exercise at night, again causing him to "choose between out of cell time [and] sleep."  *Id.* at 15.

In 2017, Boorman was the "Administrative Sergeant in SDCJ," "responsible for staffing for the facility, purchasing and contracting, budgeting, maintenance issues, facility needs, and responding to grievances when appropriate."  *See* Declaration of Sgt. Aaron Boorman ("Boorman Decl.," ECF No. 148-7) ¶ 2.  Moreover, during this period, Boorman "did not work on an inmate housing floor," nor did he have any "personal interactions with Plaintiff while he was housed at SDCJ."  *Id.* ¶ 4.  Plaintiff disputes this by stating that he "believes that Sgt. Boorman came and talked to him, but did not identify himself."  Pl.'s SSUF at No. 66.  However, this statement is directly contradicted by Plaintiff's own deposition testimony, in which he testified that he has no "memory of personally interacting with Aaron Boorman at any point."  McNamara Decl. Ex. A at 289:1–3.

Boorman was given Plaintiff's March 29, 2017 letter, which "had been routed from the Ridgehaven Offices," a week after it was mailed.  Boorman Decl. ¶ 5.  Writing a letter directed to the Sheriff is not typically a "means of submitting a grievance under the Department's grievances procedures," but Boorman responded to the letter as a "first level

/ / /

grievance." *Id.* There is a three-level grievance process and, "[u]nder the grievance procedure in SDCJ, Sergeants can respond to first level grievances." *Id.*

It is undisputed that Boorman responded to Plaintiff's first level grievance. *See id.* ¶ 8; LOE Ex. E. In Boorman's response, he acknowledged that Plaintiff had "complaints about sleep deprivation due to the jails [sic] program and inability to get your grievances answered." LOE Ex. E. Boorman indicated that he understood Plaintiff had issues with how the razors were distributed and that they were "currently looking into changing the times razors are to be distributed in the facility" and "exploring different times this task can be completed." *Id.* He also acknowledged that breakfast was distributed early in the morning but that this timing was necessary "to ensure inmates are [fed] prior to going to court." *Id.* Boorman also indicated that he understood Plaintiff's "frustration and how difficult it is to sleep with other individuals in the module and on other floors making noise disturbing your sleep." *Id.* However, he also informed Plaintiff that they "cannot control this" because if they "attempted to silence every individual in a facility we would then be violating their rights and be doing it without reason." *Id.* He noted that SDCJ staff attempt to discourage these behaviors but "[d]ue to the nature of any facility or housing location you will still have this issue." *Id.* Boorman also addressed Plaintiff's claims that he had to choose between receiving health care or being able to sleep. Specifically, he addressed Plaintiff's complaint that he had to have his blood drawn at night; Boorman reviewed Plaintiff's medical history to find that Plaintiff only had his blood drawn once, nearly five months prior to his grievance. *See id.* Finally, Boorman addressed Plaintiff's complaint that he was required to "choose between sleep or yard time," indicating that "due to everyday jail procedures and population needs this is the time that is available for administrative segregation inmates to use the recreation yard." *Id.*

There is no evidence in the record that Plaintiff and Boorman had any further interaction, either in writing or in person, either prior to or following Boorman's response to Plaintiff's letter. Boorman attests that he did not have personal knowledge of the claims raised by Plaintiff that occurred prior to responding to his grievance. *See* Boorman Decl.

17-CV-813 JLS (WVG)

¶¶ 57–62. Boorman declares that "[he] examined the issues raised by Plaintiff" in his grievance, *id.* ¶ 9, and found that Plaintiff's claims regarding "sleep deprivation did not hold up under [his] investigation," *id.* ¶ 10. He also concluded that Plaintiff had been provided recreation time at times that included the morning and early evening; thus, Boorman "did not believe that Plaintiff was actually being forced to sacrifice exercise in order to acquire sleep." *Id.* ¶ 50.

As set forth above, for Plaintiff to demonstrate deliberate indifference on the part of Boorman, he must allege facts sufficient to plausibly show that Boorman actually knew and consciously disregarded an "excessive risk to [his] health or safety." *Farmer*, 511 U.S. at 837. Prison officials may actually know of a substantial risk to inmate health or safety but "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 845. Here, the record shows that Boorman reviewed all the claims made by Plaintiff in his grievance, investigated those claims, and determined that his claims were unfounded. Plaintiff has offered no admissible evidence to dispute Boorman's showing that he reasonably responded to Plaintiff's claims; thus, Boorman cannot be found to have been deliberately indifferent to Plaintiff's condition of confinement claims.

For these reasons, the Court finds Defendant Boorman is entitled to summary judgment with respect to Plaintiff's Fourteenth Amendment conditions of confinement claims found in counts two, three, and four of his TAC.

### 3. *Defendant William Gore—Respondeat Superior*

Defendant Gore, in his role as San Diego County Sheriff, moves for summary judgment on the ground that he had "no personal involvement with any of the conditions alleged in this case, or any knowledge of Plaintiff." MSJ Supp. at 26. In his Opposition, Plaintiff "abandons the claim against Sheriff Gore individually, but maintains a suit against the County." Opp'n at 41. Based on this representation, the Court finds Defendant Gore is entitled to summary judgment as to all claims asserted against him in his individual capacity. To the extent that Plaintiff seeks to pursue claims against Gore in his official

capacity, the Court will treat this as a suit against the County of San Diego. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[An] official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

### D.   Monell *Liability*

The County moves for summary judgment as to all Plaintiff's conditions of confinement claims on the ground that Plaintiff fails to "create disputes of material fact as to whether the County is liable for the alleged constitutional violations." MSJ Supp. at 30.

To prevail on a claim for violation of constitutional rights under 42 U.S.C. § 1983, a plaintiff must prove two elements: (1) that a person acting under color of state law committed the conduct at issue; and (2) that the conduct deprived the claimant of some right, privilege, or immunity conferred by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Nelson v. Campbell*, 531 U.S. 637, 643 (2004). Municipalities cannot be held vicariously liable under section 1983 for the actions of their employees. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

To establish municipal liability under section 1983, a plaintiff must show that "a policy, practice, or custom of the entity" is "a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). In doing so, "a direct causal link between municipal policy or custom and the alleged constitutional deprivation" must be shown. *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386 (1989)). Municipal liability is contingent on an actual violation of the plaintiff's constitutional rights, even if no individual officer is liable for the violations. *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994). *Monell* liability cannot, however, be founded on a respondeat superior theory. *Canton*, 489 U.S. at 385.

/ / /

Put more simply, to hold a government entity liable under section 1983, a plaintiff must show that the alleged unconstitutional act resulted from "(1) an employee [of the entity] acting pursuant to an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a 'final policymaker.'" *Delia v. City of Rialto*, 621 F.3d 1069, 1081–82 (9th Cir. 2010) (quoting *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)); *see Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002); *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

The Court now will address each County policy alleged in Plaintiff's TAC to be the source of the purported violations of Plaintiff's constitutional rights.

    1. *Excessive Light*

First, Plaintiff alleges that he was denied his "right to sleep" due to Defendants' "implementation, training, and execution of [] policies" that caused Plaintiff to be unable to sleep due to "excessive lighting." TAC at 17. Plaintiff claims that there is a policy that leaves his cell light consistently on, although Plaintiff acknowledges the lighting is lowered at night. *See id.* at 8. Nonetheless, Plaintiff claims that he is "still subjected to 24-hour illumination, which is too bright to allow a human being to sleep." *Id.*

Defendants submit the declaration of Scott Bennett, who is the "Project Manager for the Department of General Services" and who "oversee[s] maintenance for the San Diego Sheriff's Department Detention facilities," to support their claim that the type of lighting Plaintiff was exposed to does not rise to the level of a constitutional violation. Declaration of Scott Bennett ("Bennett Decl.," ECF No. 148-6) ¶ 1. Given this experience, Bennett is "familiar with the [SDCJ] facility, including the cell layouts, and lighting." *Id.* ¶ 2. He declares that each cell has a "single light fixture in the center of the ceiling." *Id.* The light fixture has fluorescent bulbs with two settings. *See id.* In one setting, all the bulbs in the fixture are turned on, and the second setting is a "night light/security light" setting in which only one "compact, seven watt bulb is lit." *Id.*

/ / /

Bennett declares that he took "light meter readings" that measure the "amount of illuminance provided by the security light" in a cell of the same type Plaintiff has been housed in that has "not had any significant changes made to it" since 2016–2017 that "would affect the amount of light emitted by the security light that reaches the bunks." *Id.* ¶¶ 5–7. Bennett attests that the "light fixtures and bunks have not moved, the bulbs used are the same, and the doors are also the same" as in the relevant 2016–2017 timeframe. *Id.* ¶ 7. Bennet took the measurements of the light level from both sides of the bottom bunk and also "measured from the center of the bunk," where you expect a person to have his head resting. *Id* ¶ 8. Illuminance is measured in lux and footcandles, and "footcandles (fc) is equal to the illuminance in lux (lx) times 0.09290304." *Id.* ¶ 10. Bennet's readings indicated that, with the cell door closed, cell light off, and night light on, the footcandles reading was 0.0 to 01. *Id.* ¶ 9. The lux value with the cell door closed, cell light off, and night light on was 0.0 to 1.07639. *Id.* This is "the same amount of illuminance as moonlight." MSJ Supp. at 16.

Defendants have submitted evidence that the security light setting at issue in this matter consists of "one, compact, seven watt bulb." *Id.* ¶ 2. Plaintiff objects to this submission, claiming "Plaintiff cannot know the security light at night was a 7 [watt] compact fluorescent bulb" and he "never tried to quantify the lights in any sort of scientific fashion." Pl.'s SSUF at No. 24. However, as Defendants' reply to this objection indicates, "Bennett's declaration is based on personal knowledge regarding the type of lighting used during the time at issue as well as his observations regarding the measurements of those lights which he is qualified by training and experience to make." *See* ECF No. 165-1 ("Reply SSUF") at No. 24. Plaintiff's lack of knowledge, lack of expertise, and/or failure to retain expert witnesses to support his claims or to dispute the factual claims made by Defendants do not create a disputed material fact. Plaintiff cannot oppose Defendants' properly supported summary-judgment motion by "rest[ing] on mere allegation or denials of his pleadings." *Anderson*, 477 U.S. at 256. Here, Plaintiff's objection merely indicates

/ / /

that he has no evidence to dispute the showing made by Defendants that the lighting at night was minimal.

In addition, Defendants submit California regulations and testimony to show that it is necessary to have the security light remain on at night. Specifically, the California Code of Regulations requires lighting in detention facilities to be as follows:

> Lighting in housing units, dayrooms and activity areas must be sufficient to permit easy reading by a person with normal vision, and shall not be less than 20 footcandles (215.2 lux) at desk level and in the grooming area. Lighting shall be centrally controlled and/or occupant controlled in housing cells or rooms. *Night lighting in these areas shall be sufficient to give good visibility for purposes of supervision.* In minimum-security areas, lighting may be supplied by ordinary lighting fixtures, and in areas of higher security, light fixtures must be of secure design.

24 Cal. Code Regs. § 1231.3.6 (emphasis added). Both Defendants Lovelace and Boorman attest that "[t]urning off security lights prevents SDCJ staff from, among other things, performing regular inmate cell counts, checking on cell structural integrity, and ensuring that inmates did not engage in unauthorized behavior while in their cells." Lovelace Decl. ¶ 22; Boorman Decl. ¶ 18. They further declare that "[t]urning off or covering security lights would increase the risk of harm to correctional deputies from inmate assaults," and that "the security light allows deputies to scan the cell for any movement or condition within the cell which would alert them to a potential danger as they approach the cell door." *Id*. Defendant Lovelace attests that "SDCJ inmates were allowed to cover their eyes, if they so desired, with something such as a blanket, or a sock," to block the security light's minimal illumination. Lovelace Decl. ¶ 26.

Plaintiff argues in response that "dormitories are available where there are no security lights in the cell." Pl.'s SSUF at No. 26. Defendants argue, however, that Plaintiff "has not offered any evidence in support of his incorrect statement" that there are no security lights in "dormitories." Reply SSUF at No. 26. Defendants also maintain that ///

Plaintiff could not have personal knowledge about the lighting in these dormitories because he was "never housed in such an area." *Id.*

The Court agrees that Plaintiff points to no evidence in the record to overcome Defendants' showing that the policy of having a security light in the cell is necessary for security and does not violate Plaintiff's constitutional rights.

### 2. Night Exercise

Next, Plaintiff maintains that he suffered from sleep deprivation "under the County's policy of scheduling exercise time at night." TAC at 17. Defendants move for summary judgment on the ground that Plaintiff was provided adequate exercise and there is no evidence that he was forced to choose between exercise and sleep, contrary to what Plaintiff contends. *See* MSJ Supp. at 19.

Defendant Boorman attests that it was the policy in 2017 that "administrative segregation inmates received opportunities to exercise and spend time out of cell in the dayrooms of their modules for at least fifty minutes each day, seven days a week, between the hours of 7:00 a.m. through 9:00 p.m." Boorman Decl. ¶ 45. In addition, "inmates in administrative segregation had an opportunity for additional out of cell exercise in the recreation yard two to three times a week for a ninety-minute block of time, between 7:00 p.m. and 5:00 a.m." *Id.* ¶ 46. Boorman further attests that "[i]nmates in the administrative segregation module cannot, for security reasons, go to yard with other inmates" and, "[b]ecause of this, cycling the inmates in module E through the recreation yard can take ten hours each day." *Id.* ¶ 47. Therefore, in order to "offer yard time to all five modules on each floor, recreation yard must be offered on a 24-hour basis." *Id.*

Recently, the Ninth Circuit issued an opinion noting that "there is no bright line test to determine if and when inmates are entitled to outdoor exercise." *Norbert v. City & Cnty. of San Francisco,* 10 F.4th 918, 933 (9th Cir. 2021). Instead, according to the Ninth Circuit, in determining whether jail officials are providing constitutionally adequate exercise time, there must be a totality of the circumstances evaluation. *See id.* at 933–34. These circumstances include other opportunities for indoor recreation, the length of time

the inmate is held under the conditions, the opportunities for the inmate to have contact with others, the impact of disciplinary measures, and whether the inmate has opportunities for training and rehabilitation programs. *See id.*

Here, Defendants submit evidence that Plaintiff was offered out-of-cell exercise in two environments, the dayroom and recreation yard. *See* Boorman Decl. ¶¶ 45–46. Plaintiff himself testified that "most days" he had access to the dayroom. McNamara Decl. Ex. A at 250:22–25. Plaintiff also testified that he could exercise in his cell. *Id.* at 251:1– 2. He also acknowledged that he could exercise in the dayroom, although he claimed "it was not a very sanitary place to exercise." *Id.* at 251:3–6. However, Plaintiff offers no evidence to support his claims regarding sanitation or how such conditions would prevent him from exercising indoors. In *Norbert*, the Ninth Circuit concluded that the plaintiffs "have not identified any risk of harm, substantial or otherwise, from having their exercise time take place indoors, as opposed to outdoors." 10 F.4th at 934 (citing *Farmer*, 511 U.S. at 828; *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004)). The same is true here. Plaintiff offers no evidence to show that being provided opportunities to exercise indoors versus outdoors caused him any harm.

Accordingly, Plaintiff points to no evidence in the record to overcome Defendants' showing that the policy of conducting outdoor exercise at night does not violate Plaintiff's constitutional rights.

### 3. *Mentally Ill Inmates*

Finally, Plaintiff claims that there is a County policy of housing "mentally ill inmates in 'Ad-Seg' due to their mental illness which causes extremely noisy and constant interruptions." TAC at 18. However, Defendant Boorman attests that there is no such policy. *See* Boorman Decl. ¶ 40. Rather, Boorman declares that "inmates with mental health issues were not typically housed in administrative segregation"; instead, SDCJ had other housing areas where "inmates with mental health issues were housed and treated for their conditions." *Id.* On the occasions that inmates with mental health issues were housed in administrative segregation due to "disciplinary or behavioral issues," they were not

"typically housed, as a matter of practice, with inmates who were housed in administrative segregation for security reasons, like Plaintiff." *Id.* ¶ 41.

Plaintiff offers no evidence, nor does he point to any evidence in the record, that would show there was a policy or practice to house inmates with mental health issues in administrative segregation with inmates in administrative segregation who have no mental health issues and therefore fails to raise a material fact as to this claim.

### E. Conclusion

Having reviewed the evidence presented, the Court finds no genuine dispute of material fact regarding Plaintiff's conditions of confinement claims under section 1983 against the County and Defendants Lovelace, Boorman, and Gore. Even viewed in the light most favorable to Plaintiff, the nonmoving party, no triable issue of fact exists to show Defendants violated his constitutional rights as related to his conditions of confinement claims. Accordingly, the Court **GRANTS** Defendants' MSJ as to Plaintiff's section 1983 claims found in counts two, three, and four of his TAC.

### F. Qualified Immunity

Defendants also argue the Court should grant summary judgment because they are entitled to qualified immunity as to Plaintiff's conditions of confinement claims. Government officials have qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A claim of qualified immunity requires a two-pronged inquiry: (1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and (2) whether such right was clearly established at the time of the defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 535 U.S. 194, 201 (2001)). The court may exercise its discretion in deciding which prong to address first based on the circumstances of the case. *Id.* at 236 (noting that, while the *Saucier* sequence

is often appropriate and beneficial, it is no longer mandatory).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant.  *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

As discussed above, Plaintiff has failed to raise a triable issue as to whether Defendants violated his constitutional rights arising from his conditions of confinement claims.  Thus, there is no need to determine whether Defendants are entitled to qualified immunity based on clearly established law.  *See Saucier*, 533 U.S. at 201.

## II.   Defendants' Supplemental MSJ (ECF No. 153)

Defendants also have moved for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a) prior to filing his 42 U.S.C. § 1983 complaint.  *See generally* Supp. MSJ.  Because the Court has already found that Defendants are entitled to summary judgment as to three of the four counts found in Plaintiff's TAC, *see supra*, the Court need only consider whether Plaintiff exhausted his administrative remedies as to the sole remaining Fourteenth Amendment due process claim found in count one of his TAC.

### A.   *Legal Standard*

When a defendant seeks summary judgment based on a plaintiff's failure to exhaust specifically, the defendant first must prove that there was an available administrative remedy and that the plaintiff did not exhaust that available remedy.  *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc)) (quotation marks omitted).  If the defendant so proves, the burden of production then shifts to the plaintiff "to show that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Id.*  Only "[i]f undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, [is] a defendant . . . entitled to summary judgment under Rule 56."  *Albino*, 747 F.3d at 1166.

/ / /

### B.    Analysis

Defendants argue that summary judgment must be granted in their favor because Plaintiff failed to exhaust his administrative remedies before filing his Complaint.   *See generally* Supp. MSJ.

### 1.    Legal Standards for Exhausting Administrative Remedies

"The [PLRA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions."   *Ross v. Blake*, 578 U.S. 632, 635 (2016) (quoting 42 U.S.C. § 1997e(a)).   "There is no question that exhaustion is mandatory under the PLRA[.]"   *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citation omitted). The PLRA also requires that the grievant adhere to SDCJ's "critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 91 (2006).   "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."   *Jones*, 549 U.S. at 218.

The exhaustion requirement is based on the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being hauled into court."   *Id.* at 204.   The "exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims."   *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Therefore, regardless of the relief sought, a prisoner must pursue an appeal through all levels of a jail's grievance process as long as that process remains available to him. "The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.'   Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance."   *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (emphasis in original) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). "The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'"   *Ross*, 578 U.S. at 648; *see also Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010) (stating that the PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable").

24

Grievance procedures are available if they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738); *see also Williams*, 775 F.3d at 1191 ("To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'") (quoting *Albino*, 747 F.3d at 1171). In *Ross*, the Supreme Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is *not* capable of use to obtain relief." 578 U.S. at 643 (emphasis added). These circumstances arise when: (1) the "administrative procedure . . . operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use . . . so that no ordinary prisoner can make sense of what it demands;" and (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60 (citations omitted).

Applying these principles, the Ninth Circuit has specifically found that "[w]hen prison officials fail to respond to a prisoner's grievance within a reasonable time, the prisoner is deemed to have exhausted available administrative remedies within the meaning of the PLRA." *See Andres v. Marshall*, 854 F.3d 1103, 1105 (9th Cir. 2017) (per curiam) (finding prison's 6-month failure to respond to an inmate grievance rendered prisoner's administrative remedies unavailable); *accord Dole v. Chandler*, 438 F.3d 804, 809, 811 (7th Cir. 2006) (officials' failure to respond to a "timely complaint that was never received" rendered prisoner's administrative remedies unavailable). The Ninth Circuit has further found administrative remedies "plainly unavailable" where prison officials "screen out an inmate's appeals for improper reasons," *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010), and "effectively unavailable" where officials provide the inmate mistaken instructions as to the means of correcting a claimed deficiency but, upon resubmission, reject it as untimely after compliance proved impossible, *see Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010). Administrative remedies may also prove unavailable if the prisoner shows an "objectively reasonable" basis for his belief that "officials would

retaliate against him if he filed a grievance." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015).

Because the failure to exhaust administrative remedies is an affirmative defense, defendants bear the burden of raising the issue and proving the absence of exhaustion. *Jones*, 549 U.S. at 216; *Albino*, 747 F.3d at 1169 (noting that defendants must "present probative evidence—in the words of *Jones*, to 'plead and prove'—that the prisoner has failed to exhaust available administrative remedies under § 1997e(a)"). Otherwise, defendants must produce evidence proving the plaintiff's failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows he failed to exhaust. *Albino*, 747 F.3d at 1169

### 2.    SDCJ's Exhaustion Requirements

With respect to their initial burden on summary judgment, the Court finds Defendants have offered sufficient evidence, which Plaintiff does not contradict, to prove that SDCJ has established an "administrative remedy" for prisoners, like Plaintiff, to pursue before filing suit under section 1983. *See Williams*, 775 F.3d at 1191 (citing *Albino*, 747 F.3d at 1172).

Specifically, Defendants submit a declaration, accompanied by exhibits, from Kevin Kamoss, who is currently a Lieutenant for the San Diego Sheriff's Office and who served as the Watch Commander for SDCJ from 2016 to 2017. *See* Declaration of Lt. Kevin Kamoss ("Kamoss Decl.," ECF No. 153-3). Kamoss attests that he is "familiar with the Sheriff Department's policy and procedures as they pertain to inmate grievances and with the manner in which inmate booking, grievance, and disciplinary records are maintained." *Id.* ¶ 2. The SDCJ's inmate administrative grievance procedure is set forth in the San Diego County Sheriff Department Detention Facilities Manual Policy and Procedures section N.I. *Id.* ¶ 3; *see also id.* Ex. B (copy of section N.1 and blank grievance form).

Kamoss attests that the "[SDCJ] booking process shows all incoming inmates entering each facility a video presentation explaining the administrative grievance

process." *Id.* ¶ 4. The "video is re-played on all dayroom televisions throughout every County detention facility daily," and the grievance procedure also is "posted on the walls of housing modules." *Id.*

There are two ways to submit a grievance. *See id.* ¶ 5. First, an inmate can place the written grievance "in the locked grievance box" located in his housing module. *Id.* If the inmate chooses this method, he will "receive the second page of the form within a couple of days, signed by a staff member." *Id.* Alternatively, an inmate can hand his grievance "directly to a deputy or other staff member" as long as the inmate is in an area he has permission to be in. *Id.* The staff member that accepts that grievance will "sign the grievance and give [the inmate] back the second page of the form." *Id.* The grievance will be "answered within ten (10) days of the time [the inmate] submit[s] it to a staff member." *Id.* If an inmate chooses to appeal a grievance to a "higher level of command," there will "be another ten-day response time." *Id.* An inmate can appeal a grievance to the level of the facility commander, which will be the final decision. *See id.*

Each level of review "has authority to attempt to resolve the grievance." *Id.* ¶ 8. Moreover, each level of review "provides the inmate with a written response and resolution or the reasons for the denial." *Id.*

Once a staff member receives a grievance, "an entry is made into the JIMS system" and the original grievance form is placed in the inmate's custody record. *Id.* ¶ 11. A "scanned copy of the custody record is maintained as a regular part of Sheriff's department business." *Id.* This process is followed for "each appeal of a grievance." *Id.*

### 3. *Plaintiff's Administrative Appeal History*

As discussed above, Plaintiff alleges in his TAC that Defendants violated his Fourteenth Amendment rights when they allegedly

> plac[ed] Plaintiff in Ad-Seg at [SDCJ] without any notice, written or otherwise, as to the reason for his placement in an indefinite Ad-Seg term, denying Plaintiff a hearing with anyone, including the 'critical decision maker,' denying Plaintiff any opportunity to rebut the charges, whatever they may be, denying

17-CV-813 JLS (WVG)

> Plaintiff any periodic review of his placement and refusing to inform Plaintiff what, if anything, he could do to obtain release from Ad-Seg.

TAC at 15.  Defendants, on the other hand, contend that summary judgment must be granted on this claim because there is no genuine dispute that Plaintiff failed to properly exhaust his administrative remedies through the third level prior to filing his federal complaint in this Court.  *See generally* Supp. MSJ.

Plaintiff submitted a grievance on October 5, 2016, in which he requested to be "removed from Ad-Seg/Placed in High Security Threat Group housing."  ECF No. 153-2 at 28.  This grievance was processed and responded to by Sergeant Froistad on October 6, 2016.  *See id.*  Plaintiff's request was "denied," and it is indicated that a "[r]esponse [was] sent to [Plaintiff]."  *Id.*  There was additional narrative attached, indicating that a "decision was made that your current status in Administrative Segregation would not change at this time" and that this decision was "based largely on your history in the State Prison and the influence you may have over the population."  *Id.* at 29.

Plaintiff filed another grievance on October 14, 2016, claiming that he has "been provided no explanation" as to why he continues to be housed in administrative segregation.  *Id.* at 30.  On this same form, it is indicated that this "submission is not a grievance" but rather it is designated as an "inmate request."  *Id.*  The handwritten response states: "due to your history while in custody with the Dept. of Corrections a monthly review of your history will follow."  *Id.*

However, Plaintiff testified in his deposition that he actually did receive the response from Sergeant Froistad denying his request to be removed from administrative segregation.  *See* Supp. MSJ Supp. at 15 (271:3–11).  Plaintiff also testified in his deposition that he appealed this grievance response.  *See id.* at 16 (272:15–25).  He claims he "gave it to a deputy," but he does not have a copy of his appeal.  *Id.*  Plaintiff also testified that he did not receive a response to this appeal.  *See id.* at 17 (273:11–12).

/ / /

Defendants contend that summary judgment is required here because Plaintiff failed to completely exhaust his administrative remedies before filing his federal complaint. *See generally* Supp. MSJ. In support, Defendants submit the declaration of Dennis Flynn, who was a Captain at SDCJ in 2016 and 2017. *See* Declaration of Capt. Dennis Flynn (Ret.) ("Flynn Decl.," ECF No. 153-4). Flynn was the Facility Commander for SDCJ as well, a position that required him to review all "third-level grievance appeals." *Id.* ¶ 3. Flynn attests that "Plaintiff never submitted any third-level appeal on the issues in this lawsuit in 2016 or 2017." *Id.* Plaintiff did file one third-level appeal, but it did not involve the issues in this litigation (rather, it involved a "search of his person and his cell"). *Id.*

In response, Plaintiff argues that he "filed grievances about his placement in administrative segregation and he was unequivocally told that his housing assignment would never be changed." Opp'n at 45. He goes on to argue that, "[u]nder these circumstances, any grievance process afforded by the jail is rendered inadequate because by predetermining the result of the grievance the process is 'practically unavailable.'" *Id.* Plaintiff offers no legal authority for this proposition. Plaintiff also argues, again without citing to any legal authority, that "if a grievance is timely answer[ed] it cannot be timely appealed." *Id.* This argument is misleading at best, given that Defendants have set forth the procedure by which an inmate may appeal a decision with which he disagrees and, in fact, there is ample evidence in the record that Plaintiff was well aware of the grievance procedure at SDCJ and his ability to file appeals.

Based on the foregoing, the Court concludes Defendants are entitled to summary judgment under Rule 56, because the "undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust" administrative remedies, and Plaintiff has failed to satisfy his burden to show administrative remedies were "unavailable" to him. *See* Fed. R. Civ. P. 56; *see also Albino*, 747 F.3d at 1166. Accordingly, the Court **GRANTS** Defendants' Supplemental MSJ as to Plaintiff's Fourteenth Amendment due process claim based on a failure to exhaust.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 148), **GRANTS** Defendants' Motion for Summary Judgment for failing to exhaust as to Plaintiff's Fourteenth Amendment due process claim (ECF No. 153), and **DIRECTS** the Clerk of the Court to enter a final judgment in favor of all Defendants and to close the file.

**IT IS SO ORDERED.**

Dated:  July 18, 2022

Hon. Janis L. Sammartino
United States District Judge

17-CV-813 JLS (WVG)